Richard S. Lane, J.
Perjury was committed by plaintiff during the trial before me and a jury of this personal injury automobile negligence action. It was not committed by one who has been the victim of prejudice or of economic adversity, but by a well-educated successful young man. It was not committed inadvertently, nor capable of being rationalized as the product of the frailty of human memory, but deliberately. It was not committed in the heat of battle in an attempt to tip the scales in his favor, but, with liability conceded, in an attempt to achieve a significantly larger recovery than warranted by the injuries he suffered.
A brief account of the circumstances will help demonstrate how aggravated was this assault on the dignity and repute of the court and the entire judicial process. After plaintiff had testified to the happening of the accident, his counsel turned to the subject of medical treatment. Plaintiff in response described his first several visits to his doctor. The next question asked how many times in all he had gone to the doctor for treatment, and there was an objection. During a consultation at the Bench, I learned that defendant’s counsel anticipated an answer so *1051 large as to require medical substantiation, and that the doctor was dead. At this point I excused the jury and invited an offer of proof. I was advised by plaintiff’s counsel that plaintiff would testify to about 45 visits over a period of about four months. At my request plaintiff’s counsel handed up a copy of the doctor’s report, which was not helpful, and a copy of the doctor’s bill which reads as follows:
“ 11/14/69 orthopedic consultation 11/17/69 X-rays Physiotherapy 3x week (15) $50.00 75.00 225.00 $350.00 ”
Suggesting that it was ambiguous from the bill whether the “ 15 ” referred to visits or weeks, I asked if plaintiff’s counsel had inquired of the doctor’s office. His reply was stumbling, so I turned to plaintiff still on the stand and asked directly how many treatments he had received. Without any hesitation he answered “45”. On this basis I ruled over the objection of defendant’s counsel that plaintiff would be allowed to so testify before the jury, and thereafter he did so.
The next morning before the beginning of continued testimony, defendant’s counsel produced the doctor’s records which showed incontrovertibly that plaintiff had lied. The “ 15 ” had indeed referred to the number of visits, not the number of weeks and the course of treatment had lasted about five weeks.
Shocked, I asked counsel where we went from here and indicated that I was considering contempt proceedings.
After some time conferring with his client, plaintiff’s counsel informed me that he wished to discontinue the case and that his client wished to make a statement to the court. My response was that he was free to dispose of the case in any manner he deemed advisable, but that nothing should be done in the expectation that it would affect my thinking on the question of contempt. I also advised against any statement before consulting with counsel more experienced in criminal matters. Then I recessed for lunch after which plaintiff formally discontinued.
So that the record would be clear, I called the doctor’s nurse to the stand, had her verify the doctor’s file as kept in the ordinary course of business, and had it and the doctor’s bill marked as court exhibits.
In her testimony, the nurse alluded to a second file in the doctor’s office in connection with a subsequent accident some six months later. Another piece of the puzzle had fallen into place.
Now I have three alternatives. I can forget the whole matter *1052 on the theory that plaintiff has already been scared and sufficiently punished by the loss of a sure recovery in the action. I can forward the transcript to the District Attorney. I can follow my original instinct and cite for contempt. The first would bb abdication of my responsibilities. The second would unfortunately be a futile gesture, it being well known that the District Attorney, beset with the violent crime all around us, has neither the time nor the resources to prosecute for perjury in a civil case. Accordingly, I have today signed van order directing plaintiff to show cause why he should not be (cited for contempt. |
In doing so, I am not unaware of the conventional wisdom that perjury in and of itself does not constitute contempt. To the elements which make up the crime of perjury there must be added an element of obstructing the court in the performance of its duties; and, although all perjured relevant testimony wars with justice in that a wrong result may be reached, the concept of “ obstructing ” the court requires something considerably more tangible. There must be something which disrupts the orderly disposition of judicial business (Matter of Michael, 326 U. S. 224; Matter of Hudgings, 249 U. S. 378; Matter of Finkel v. McCook, 247 App. Div. 57, affd. 271 N. Y. 636; Matter of Shapolsky, 8 A D 2d 122; Ann. 89 ALR, 2d 1258 et seq.; But see, Note, 7 Vand. L. Rev., 272, 277-280, critical of this approach). Am I merely defying conventional wisdom because this is my first head-on encounter with perjury and I am personally outraged? The answer is negative.
As Mr. Justice Cabdozo so eloquently wrote in Clark v. United States (289 U. S. 1, 11-12), an obstruction to justice will not lose the quality of contempt merely because one of its aggravations has. been the commission of perjury. As I see it the contempt and the obstruction to justice here lie in the practice sometimes referred to as “ padding the case ”, and the perjury was merely its handmaiden. Plaintiff, perhaps shrewdly but erroneously calculating that his dead doctor could no longer contradict him, saw an opportunity to obtain from this defendant additional compensation for his medical expenses and his pain and suffering arising out of another accident (United States v. Johansen, 36 F. Supp. 30 [S. D. N. Y., 1940]). Another variant of “ padding ” is obtaining more medical attention than is warranted in order to make the injuries and consequent - pain and suffering loom larger to the trier of fact. In either event, the court is being used; the court is an instrument in a scheme which deserves to be labeled extortion. Such improper use of *1053 the court, as for instance false swearing to prohate a forged will, has always been seen as contemptuous (Bloom v. Illinois, 391 U. S. 194; Matter of Melody, 42 Ill. 2d 451; Matter of Kelly, 365 Ill. 174; see State v. Moquin, 105 N. H. 9; see Swanson v. Swanson, 8 N. J. 169).
The conventional formula for contempt is satisfied in the cases above cited and in the instant case. They disrupt and obstruct the orderly disposition of judicial business in that they clog the calendar with matters which, but for the perfidious conduct, would undoubtedly never reach the trial stage. Defendant here had offered $1,250 in settlement. Any experienced hand in the negligence field would wager that, with such a start and with the plaintiff telling the truth as to his medical treatment, there would have been a fair settlement before trial commenced and probably even before the jury was selected. A day and a half would thus have been saved for cases and litigants with a more meritorious claim upon the court’s time and resources.
However, it really is not necessary to labor to find an obstruction to justice. Such talismanie language derives from the provisions of the Federal contempt statute (U. S. Code, tit. 18, § 401). The New York law is much broader and empowers punishment for contempt where the conduct tends to interrupt the court’s proceedings or to impair the respect due to its authority (Judiciary Law, § 750, subd. A, par. 1). There is thus added to the concept of “ obstructing ” justice the entirely different concept of impairing the respect due to the court. An overt attack on the court’s dignity and repute is enough even if it does not interfere with the smooth functioning of the court. With one exception the leading New York cases which repeat the Federal language really involve not section 750 (subd. A, par. 1) of the Judiciary Law but rather section 750 (subd. A, par. 5), and the question really posed has been whether inconsistent and evasive responses to questions can be equated with a refusal to answer punishable by said subdivision. The exception is Matter of Tamberg v. Waltemade (19 A D 2d 874) where a contempt holding was reversed. There the perjury concerned plaintiff’s residence which was immaterial to the outcome of the ease, and a perusal of the original trial transcript in the Appellate Division files will quickly convince that the case has little precedential value.
The word? in section 750 (subd. A, par. 1) concerning impairing the respect due to the court’s authority have never to my knowledge been judicially interpreted, but can anyone say that what happened in my courtroom, which among other things led *1054 me to an erroneous ruling, does not attack the integrity of the judicial process and the esteem in which the court should he held? Indeed perjury in court is an open scandal. It happens all the time, I am told. Litigants try it because they think they can get away with it and at worst, if brought to light, the jury will only reduce the recovery to what it ought to be. Who can blame skeptical insurance carriers for defendants from holding back' on fair offers and fair settlements, thus clogging our calendars and inviting such proposals as the various forms of “ no fault ” insurance. Such proposals neatly excise large segments of our jurisdiction because, it is argued, we have been unable ■to handle them well. The courts should strike back where they can in an effort to preserve unimpaired for our community the precious asset which is the judicial process. • Here is one such opportunity.
If perchance I have been in error and what appears to me to have been clear perjury has a reasonable explanation, plaintiff assisted by counsel of his own choice will have a fair hearing on the return date of my order to show, cause. For this purpose and because I have waited some weeks while engaged in research, I suggest that the hearing be referred to some Judge other than myself (Mayberry v. Pennsylvania, 400 U. S. 455; Nilva v. United States, 352 U. S. 385, 395).