People of the State of Illinois, Plaintiff-Appellee, v. Dale A. Dronso, Defendant-Appellant.

Gen. No. 51,150.

First District, Fourth Division.
April 28, 1967.
Rehearing denied May 25, 1967.

Frank Ferlic and Horace Lund, of Chicago (Frank Ferlic, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Zagel, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

CHARGE: Armed robbery.*

DEFENSE AT TRIAL: Defendant denied that he committed the alleged offenses.

JUDGMENT: The defendant was indicted for two robberies by force and while armed. One was the robbery of Anna Sokolowski; the other the robbery of Elmer Dobesh. The cases were consolidated for trial. After a jury trial the defendant was found guilty as charged in both indictments and was accordingly sentenced to the penitentiary for one to three years.

POINTS RAISED ON APPEAL:

1) The evidence was insufficient to support a finding of guilty;

2) The State failed to call all its available witnesses;

3) The argument of the State's Attorney was improper and prejudicial;

4) The court erred in excluding defendant's children from the courtroom;

5) The court erred in refusing defendant access to police records during cross-examination.

---

* Ill Rev Stats 1963, c 38, § 18–1(a). A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force.

Ill Rev Stats 1963, c 38, § 18–2(a). A person commits armed robbery when he violates Section 18–1 while armed with a dangerous weapon.

EVIDENCE: The grand jury voted two indictments; one indictment charged the defendant, Dale A. Dronso, with the offense of robbery, while armed, from the person of Anna Sokolowski; the other charged the defendant with robbery, while armed, taking $50 from the person of Elmer Dobesh. Because the same evidence was involved, both indictments were consolidated and tried together. A jury was selected and sworn. A motion for the exclusion of witnesses was allowed. The court then excluded the defendant's children from the courtroom on the ground that their presence was merely to elicit sympathy from the jury. The defense took exception to this ruling.

**Testimony of Witnesses:**

Elmer Dobesh testified as follows: On February 13, 1964, he was in the Club 59, located at 59th and Lawndale, in Chicago. He arrived there about 10:30 p. m., and about 11:00 p. m., two men went up to the bar, one of whom he identified as the defendant. Besides the two men at the bar, the proprietor of the Club and two other people were present. The defendant told them to turn around, put their hands on the bar, that "this was a stickup," and said that "if we didn't put our hands on the bar he would kill us." When Anna Sokolowski (the owner of the tavern) hesitated, the defendant reiterated that "he would have to kill," and Dobesh told Anna Sokolowski to hand over the money. The defendant was holding a .45 automatic in his right hand; he told his accomplice to take Dobesh's billfold which contained his driver's license, his draft classification card, some personal things and a 50-dollar bill. The men then left the tavern and Dobesh followed them to try to get the make and model of the car they had, but was unsuccessful in this attempt. Dobesh said the defendant and the other man were in the tavern for only five minutes, and he next saw the defendant on June 14, 1964. Dobesh was in a restaurant at 60th and Kedzie when he saw the defendant walking

north on Kedzie. Dobesh got into his car and drove to 59th and Kedzie, where he told a police officer what had happened. The officer stopped the defendant, told him he was being questioned about the holdup in Club 59, and arrested him.

On cross-examination Dobesh described the defendant as medium build, medium height, graying hair, and cleft chin. He said that when he was told to put his hands on the bar his head was turned at a 45-degree angle and he could see the defendant and the other man clearly; that he could identify the gun as a .45. He stated that he could identify the car only as a red Oldsmobile, possibly a 1962 model; that the license plates were dirty and not readable; that the bar was well lighted. Dobesh stated that on June 14, after the defendant was arrested, Dobesh went to the police station on his own, where he gave the officers the name of Anna Sokolowski as someone who would back him up, and she came to the station.

The narrative description of the offenders, signed by officers Joynos and Scafinski, was not made available to the defense for purposes of cross-examination. In reference to Dobesh's testimony at the preliminary hearing, the court read his description of the defendant:

> "A I said graying hair, what I thought was a crew cut but it's not, cleft chin and about his height and build.
>
> "What did you say?
>
> "A I said about five feet five inches and 150 pounds."

Dobesh testified that the defendant had on a three-quarter length green suburban coat, dark pants, and did not wear a hat. Dobesh does not wear glasses; Mrs. Sokolowski does wear glasses.

On redirect, Dobesh was asked the dates of his military service; counsel for the defense objected to this evidence

and was overruled; the dates were from February 1, 1953, to November 23, 1956.

Anna Sokolowski testified that on February 13, 1964, at approximately 11:05 p. m., two men walked into her bar, and she identified the defendant as one of the men. She stated that the defendant had a gun in his hand and said, "Everybody put your hands on the bar, this is a stickup"; that he added, "Lady, don't move, I wouldn't want to kill you . . . . Give me all the bills you've got in the register." She stated that she put the money on the bar. She further testified that after the two men left Mr. Dobesh ran after them; that she called to him because he did not have a gun and she was afraid he might be hurt. She stated that she next saw the defendant on June 14, 1964, at the Chicago Lawn Police Station; that the officers had come to her bar and told her they would like her to come and identify the man who had held her up; that she was taken into a room for a showup; that all the men were Caucasian; that she was asked if she could point out the man who robbed her, and she did.

On cross-examination Anna Sokolowski testified as follows: Mr. Dobesh and two other people—Jack and Louise Langbouer—were in her tavern on February 13, 1964. Dobesh was drinking a coke, and she had "probably a drink or so that night." The man with the gun was standing near the telephone booth, and the other man was the one who came and picked the money off the bar. She described him to the police. She said that one of the men in the lineup at the police station was considerably younger than the other three, and that she did not talk to Dobesh at the station until after they had signed the complaint.

William Bebinger, a police officer with the Robbery Division, testified that he talked with the defendant at the Chicago Lawn Police Station; that he asked the defendant where he was on February 13 and the defendant "said he knew very well where he was at, but he wasn't

64

going to tell me." Bebinger did not remember whether he asked defendant if he could search his room, or whether defendant gave him permission to do so. He stated that he questioned the defendant the afternoon of the day he was arrested and also on the folowing day; that on the following day Bebinger was familiar with the offense with which defendant was charged.

Dale Dronso, the defendant, testified that he had never been in the Club 59, although he had passed there many times, since it was his neighborhood. He testified that on June 14, shortly after noon, he was walking north on Kedzie Avenue when a police car pulled over to the curb and a policeman said, "Say, fellow, do you live around here?" He said that a civilian car then pulled up behind the police car and Mr. Dobesh got out of it; that the policeman asked the defendant if he knew him and the defendant said he didn't think so; that Dobesh said, "How about February 13th, when you held the GI .45 on me?" The defendant testified that a few more squad cars arrived, and the arresting officer took him to the station where he was questioned for about an hour. He testified that Mrs. Sokolowski came in; that the defendant was then put in a lineup with three men and a boy, and Mrs. Sokolowski looked at the four of them "slowly and deliberately, and immediately excluded the young man, the boy,—" The defendant stated that Mrs. Sokolowski then looked back and forth again; that the policeman asked her if the person said anything, and she said he said "Put your hands on the bar, this is a stickup"; that the four men were then asked to repeat that statement; that Mrs. Sokolowski then identified the defendant as the man. The defendant stated the officer and he had the following conversation concerning his taking a lie detector test:

"He said, 'Now, you don't have to take this, you know that, don't you?' And I said, 'Yes, I do know

that.' And he said, 'This causes us a lot of trouble, but, today being Sunday, we can't set it up today but we will set it up for tomorrow morning.' He said, 'If you want to change your mind, change your mind now, because, don't put us to a lot of trouble.' I said, 'Don't worry, I won't change my mind.' "

The defendant was not given a lie detector test. He testified that there was no way in which he could connect up the date of the robbery; that it did not mean a thing to him. He said, "I've tried and tried and the closest I could come was to place it between Lincoln's Birthday and Valentine's Day. The 13th of February doesn't mean a thing to me." He testified that he talked to the police officer concerning the search of his apartment and told them to go ahead and search, but as far as he knew it had not been searched. He stated that he did not hold up the tavern or Mr. Dobesh or Mrs. Sokolowski.

The defense then rested. In rebuttal, the State introduced a prior conviction of Dale Dronso for assault. William Bebinger was recalled as a witness and testified that the defendant had requested a lie detector test on Sunday, but had refused it the following morning. The State then rested its case.

OPINION: The first question raised by the defendant is that he was not convicted beyond a reasonable doubt. In this court he argues that the identification made by Dobesh was a doubtful one. It is true the identification was made four months after the robbery was committed. Dobesh testified that he could clearly see the men who were holding up the tavern; that the tavern was well lighted, and that he described the men to the police immediately after the robbery. Dobesh's identification was positive.

██ Defendant also argues that doubt was thrown on Mrs. Sokolowski's identification of Dronso because she testified that before she went to the police station where

66

he was in custody, she was told they had caught the man who held her up. She further testified that when she went to the police station she saw Dobesh there; that there were four men in a lineup; that she asked to hear Dronso speak, and when he did she identified him as the robber. The fact that she was told that the man who was accused of holding up her tavern had been caught, is immaterial; there is no showing that she was influenced by that statement in identifying Dronso; she positively identified him. In People v. Hynes, 26 Ill2d 472, 187 NE2d 252, the same contention was raised by the defendant. The evidence brought out before the jury showed that when two State's witnesses first viewed the defendant at a police lineup about six months after the robbery, they were unable to identify him. The court held that the fact was not sufficient to require a reversal. In the case before us there was no question that both Dobesh and Mrs. Sokolowski identified the defendant.

In People v. Washington, 26 Ill2d 207, 186 NE2d 259, it was held that the fact that an accused is not placed among a group of persons in being presented to a witness for identification does not fatally weaken the evidence of identification, but bears only upon the weight to be accorded that evidence. Citing People v. Lamphear, 6 Ill2d 346, 128 NE2d 892; and People v. Barad, 362 Ill 584, 200 NE 858 in which latter case it was stated that positive identification by one witness who had ample and favorable opportunity to observe is sufficient to convict even though the testimony is contradicted by the accused.

■■ In the instant case the defendant also makes a point of the fact that at the time of the holdup there were two other persons in the tavern who were not called as witnesses by the State, and in support of its argument cites Waters v. People, 172 Ill 367, 50 NE 148. In that case, however, the court held that the identifying witnesses had been impeached and that there was not such

67

a clear preponderance of evidence as would be sufficient to convict the defendant. There is no requirement that the State produce all of its available witnesses in a criminal trial. People v. Sustak, 15 Ill2d 115, 153 NE2d 849; People v. Wright, 27 Ill2d 557, 190 NE2d 318. The contention of the defendant that the State's failure to call the two witnesses deprived him of a fair trial is without merit. People v. Huff, 29 Ill2d 315, 194 NE2d 230.

 The next contention of the defendant is that the argument of the Assistant State's Attorney trying the case was improper and prejudicial. Among other things, the Assistant State's Attorney said:

> "But we have a character assassination placed before you against Mr. Dobesh. They state, what a fool to run after a man. Well, the Purple Heart is not given to a man who drives a tank after a mouse. It is given to a man who throws his body on a grenade to save forty or fifty people in his battalion."

The State contends that the argument objected to was made in reply to counsel for the defendant. The argument of counsel for Dronso does not appear in the abstract; in the record the following statements by counsel for Dronso appear:

> "Then I think a very meaningful thing, the fact that after the man left, that Dobesh took off, by his own statement, he ran after. Now, this, one of the men at least had a gun and he was running after him to try to get, he said, the license number and he admitted he wouldn't know what to do when he got up there. He claims a lot of experience in the Army, an Army man, as an expert with a .45, but suggest the United States Army never told anybody to run out unarmed against an armed man. . . ."

68

There was evidence in the record brought out on cross-examination that Dobesh had been in the Army and was familiar with guns. Considering the evidence and the statements made by counsel for Dronso, the argument made by the Assistant State's Attorney is not sufficiently prejudicial to require reversal.

■ Dronso raises a further objection to the statement of the Assistant State's Attorney with reference to Dronso's testimony in which Dronso had said he did not know where he was on February 13, 1964, but that he guessed he was probably sleeping. In his closing argument, the comment of the Assistant State's Attorney was, "Well, I submit the best people in the world for remembering dates are women, I think all of us know that. But where is Mr. Dronso's wife in the Courtroom?" Counsel for Dronso objected and the objection was overruled. The comment of the Assistant State's Attorney need not necessarily be interpreted as a criticism because of Dronso's failure to call his wife to testify; nor do we think it could be so considered by the jury. The statement, while ill-advised, is not a matter requiring a reversal.

■ Dronso objects that he was denied his right to a public trial since the trial court excluded his children from the courtroom. At the beginning of the trial the State made a motion to exclude witnesses, which motion was allowed by the court. The court then said, "Are these youngsters the youngsters of the defendant?" When told that they were, the court said, "I think they should be removed from the courtroom." Mr. Lund (attorney for Dronso) said, "We take exception to that, your honor." The court then said:

> "Yes, I understand. That's my ruling. It will do the youngsters no good to hear the facts in this case, as they are set forth in these indictments, and their presence here can aid them in no way what-

soever. Their presence here can only be for the purpose of eliciting sympathy on the part of the jury, which is improper. They will be removed from the courtroom during the trial."

The defendant was not denied a public trial because of the exclusion of the children from the courtroom. The right to a public trial is violated only by a blanket exclusion of the members of the public. In United States v. Kobli, 172 F2d 919, the court said:

> "The right to a public trial in a criminal case which is guaranteed by the Sixth Amendment has received universal recognition in this country, the right having been similarly guaranteed by the constitutions of nearly all the states. . . .
>
> . . . . . .
>
> "After mature consideration we have reached the conclusion, in accord with the present views of the two United States Courts of Appeals which have passed upon the precise question, that the Sixth Amendment precludes the general indiscriminate exclusion of the public from the trial of a criminal case in a federal court over the objection of the defendant and limits the trial judge to the exclusion of those persons or classes of persons only whose particular exclusion is justified by lack of space or for reasons particularly applicable to them."

The defendant's children were not witnesses; they had nothing to offer to the outcome of the case. Their presence in the courtroom could only serve to arouse the sympathy of the jury, and this the defendant is not permitted to do. Further, this was a valid exercise of judicial discretion, because no good could have come of having the children hear their father's trial for an alleged robbery.

 Dronso also contends that he was refused access to the police records during cross-examination of Dobesh; however, it appears from the record that the Assistant State's Attorney stated that he had in his possession a narrative description of the defendant reported by officers Joynos and Scafinski, and out of the presence of the jury, the report was given to counsel for Dronso who read it into the record. At that time the Assistant State's Attorney stated that the records were not available to the defendant for cross-examination. Because the report did not disclose who had given the information which was recorded in the report, the court sustained the State and refused to make the report available to defendant for the purpose of impeaching Dobesh. In People v. Neiman, 30 Ill2d 393, 197 NE2d 8, it is held:

> "The law is well settled that the prosecution is required to furnish on demand to the defendant for impeachment purposes specific statements in its possession made by a State's witness which have been established to exist and which are in the witnesses' own words or substantially verbatim."

In the instant case the defendant did not then lay proper foundation to show that the statements in the report had been made by Dobesh. Under those circumstances the court correctly ruled that the report could not be used for the purpose of impeaching Dobesh.

DECISION: The judgment of the Circuit Court is affirmed.

Affirmed.

ENGLISH, P. J. and DRUCKER, J., concur.